[Civ. No. 15773.   First Dist., Div. Two.   Apr. 27, 1954.]

EDWARD SHEEHAN et al., Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Appellants.

Milton Marks, Jr., for Respondents.

GIBSON (Lilburn), J. pro tem.*—The respondents here (plaintiffs and petitioners in the court below) are members of Automotive Machinists Lodge No. 1305, and are employed by the city and county of San Francisco in the civil service position of automotive machinists. They obtained a judgment and decree of mandamus, declaratory relief, and for compensation against the appellants (defendants in the lower court) with respect to pay for which they claim to be entitled pursuant to section 151.3 of the San Francisco charter, which makes it mandatory upon the city to pay its employees at the same rate of pay as is paid in private industry to the same groups and crafts in accordance with collective bargaining agreements.

The main basis of the complaint was that the respondents were entitled, as members of this organization, to a weekly rate of pay of $84.50 per week for the year 1948; $87.50 per week for the year 1949; and $94 per week for the year 1951. It was alleged that during the weeks in which Admission Day occurred in each of these years, to wit, September 9, 1948, September 9, 1949, and September 10, 1951, the appellants had refused to pay to respondents the full weekly rate of pay as set forth in private industry, and had divided the total weekly pay rate by the number of working days in the week (5) and had deducted 1/5 thereof from their paychecks. This, the respondents contended, and contend here, was unauthorized and illegal. On the other hand, appellants concede these deductions were made, but maintain such was fully authorized and proper, that such should be so declared, and the judgment herein reversed; which brings us to a consideration of the case on its merits. (Underscoring or words in italics will be used from time to time herein for the purpose of clarity.)

Section 151.3 of the charter of San Francisco was enacted by a vote of the people in 1945, and soon thereafter approved

---

*Assigned by Chairman of Judicial Council.

by the Legislature, and so far as applicable here, reads as follows:

"Notwithstanding any of the provisions of section 151 or any other provisions of this charter, whenever any groups or crafts establish a rate of pay for such groups or crafts through collective bargaining agreements with employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and the establishments employing such groups or crafts in San Francisco, and the civil service commission shall certify that such rate is generally prevailing for such groups or crafts in private employment in San Francisco pursuant to collective bargaining agreements, the board of supervisors shall have the power and it shall be its duty to fix such rate of pay as the compensations for such groups and crafts engaged in the City and County service . . ."

At this point it may be said that as automotive machinists (Civil Service Classification M54) respondents were, at all times involved herein, "groups and crafts" employees of the city, and as such their rate of pay was fixed in conformity with the formula expressed in the above quoted portion of said section 151.3, at a rate identical with that set up in private employment in San Francisco by local bargaining agreements and in the amounts above set forth *per week*. The difficulty which confronts the parties to this action arises out of the following provision, which appears in each of such bargaining agreements:

"Employees shall have the following days off with pay: New Year's Day, Washington's Birthday, Memorial Day, 4th of July, Labor Day, Admission Day (when the celebration is held in San Francisco), Thanksgiving Day, Christmas Day. When any of the above holidays fall on Sunday, the day observed by the State or Nation shall be considered as the holiday. There shall be no deduction in pay for the above holidays."

Appellants contend the deductions were authorized because the collective bargaining agreement which determines the rate of pay does not require that Admission Day be treated as a paid holiday, except when said celebration is held in San Francisco, (it is agreed the celebration referred to is that sponsored by the Native Sons of the Golden West and that such celebration was held in San Francisco in 1950), and that the city may observe any holiday not mentioned in the collective bargaining agreement and need not pay respondents

for those days. Respondents, on the other hand, interpret this provision to mean merely that *on the specified days* the employees concerned shall have the right to the day off with pay; and so far as *other holidays* are concerned they are not entitled to such days off and the employer may require them to work; but if the employer chooses not to provide work on any such unspecified day, thus preventing them from working, this will not relieve it of its obligation to pay the full weekly rate of wage under the said bargaining agreements and the city ordinances *which have been enacted pursuant thereto* and which have fixed the foregoing as *weekly rates of pay.*

The fact is, on the three dates involved, the city closed down its shops where respondents were employed, and they were told by the city not to appear for work. Thus it is seen the employees were prevented from working, by the city, for its own purposes, and not for the benefit or purposes of the employees.

The section of the charter involved here, Section 151.3 has recently been considered by the courts. In the case of *Adams* v. *Wolff*, 84 Cal.App.2d 435 [190 P.2d 665], the plaintiffs were members of the same craft involved here. The city had refused to pay them for the holidays which the bargaining agreement said they were entitled to. They sought and obtained an adjudication that under said section 151.3 they were entitled to receive rates of pay for their services identical with that received in that area in private employment by machinists and mechanics pursuant to collective bargaining agreements by such employees with their employers, including payment for such holidays, even though they did not work on those days. The appellate court affirmed, saying: "It is quite apparent that it was the intent of section 151.3 to give to the public employees of the type here involved the same take home pay received by private employees in the same industry. That means that . . . where a work week is interrupted by a holiday they (public employees) are to receive the same pay that private employees would receive for work similarly performed. It is quite obvious that . . . pay for holidays is a part of the 'basic' rate of pay, and is as much a part of the wage structure as the hourly wage itself . . . The 'basic' 'rate of pay' is the take home pay of the employee. *The charter provision guarantees that the take home pay of public employees shall be the same as private employees.*" Here, of course, the court was considering only the question of payment for the holidays specifically mentioned

in the agreements to which section 151.3 refers, but the language used and herein referred to is significant, so far as its reference to ''basic pay'' and ''take home pay'' is concerned.

In another and later case, *Adams* v. *City & County of San Francisco*, 94 Cal.App.2d 586 [211 P.2d 368, 212 P.2d 727], this section of the charter was again considered and again it was interpreted to mean that the ''rate of pay'' was synonymous with ''take home pay.''  ██  This latter phrase, of course, does not mean the amount of money such employees get home with on payday. There may be deductions for income tax, social security, retirement, attachments and executions against their salaries which would affect the actual amount of money they, respectively, received to take home. It does mean the amount the employees are entitled to receive from their employers to take home as between themselves, the employer and employee, and before any deductions as required by third parties, are made. The section means that if the private employee under his bargaining agreement is entitled to receive before deductions the sum, for example, of $84.50 for a week's work, the city employee, performing the same services, is likewise entitled to receive the same amount for his week's work. The section and the foregoing decisions seem to be so clear on the point, no further discussion thereof appears to be appropriate.

Having seen then that the city employee must receive the same weekly rate of pay as the private employee, we now turn to the ascertainment of what such weekly rate of the latter was on the dates referred to, and when we do this we find they were as declared in the amended petition, to wit, $84.50 per week for the year 1948, $87.50 per week for 1949, and $94 per week for 1951. These respondents were ready to work on those days but were prevented by the city from so doing and at the end of each of these weeks 1/5 of their weekly wage was not paid to them, through no fault of their own.

██ We are forced to the conclusion such deductions were unauthorized. We are here concerned only with what section 151.3, which the people of San Francisco have enacted into their law, directs shall be done. There is nothing in any of the bargaining agreements which provides for any deduction in the weekly pay of any employee by reason of the employer refusing to permit the employee to work on any day or days

of the week. His wage is fixed, not at so much per hour, or per day, but at so much *per week.* "A servant is presumed to have been hired for such length of time as the parties adopt for the estimation of wages." (Lab. Code, § 3001.)

Therefore, there is an implied contract of employment between the employers and employees in private industry in which automotive machinists are employed, that the employees are employed *by the week,* and their wages are fixed by this agreement *for that period.*

▉ "Where it appears that the complaining party to a contract of hire was prevented from working by the defendant . . . the party, though he has performed no service under it, may sue on the contract and recover the agreed compensation." (*Payne* v. *Pathe Studios, Inc.,* 6 Cal.App.2d 136, 141 [44 P.2d 598].)

This seems to be the rule throughout the country. (*Oil Fields Corp.* v. *Hess,* 186 Ark. 241 [53 S.W.2d 444, 447]; 56 C.J.S. 511, 515, 533.)

But, say the appellants, the relationship between government and its employees, including the question of the employment rights and responsibilities of both the government and such employees, is governed solely by the local law under which the employment exists, and not by the law of contracts, which controls in the purely private employer-employee relationship, which, of course, is the well settled rule, and applicable here. From the foregoing discussion, we see the private employees are hired by the week, their rate of pay is fixed on a weekly basis, they are entitled to be paid by the week, and are so paid. And it is *by force of the local law,* to wit, section 151.3 of the city charter, that fixes this state of facts as being applicable to the city employees as well.

There is nothing in any law or any bargaining agreement we know of, that permitted a private or city employee to stay away from his work on any of the three days in question here. True it is, they were holidays, but there is no significance to be attached to that fact, so far as the matters being considered here are concerned. The law does not say no one shall work on Admission Day. It does say that certain institutions and public offices shall be closed on that day, but the places where these respondents worked were not of those. No doubt, many more people worked at their employment on those days than did not. More specifically, and indeed showing the interpretation put upon their bargaining agreements by private employees and their employers, and showing that "such rate"

was "recognized and paid throughout the industry," the indisputed evidence in this case shows that those employees were required to and did work on each of those days. Thus, their weekly rate of pay *for those weeks*, their take home pay, was actually greater than was that of these respondents, which is clearly contrary to both the letter and spirit of section 151.3.

It is finally urged by the appellants, however, that the case of *Gowanlock* v. *Turner*, recently decided by the Supreme Court, and reported in 42 Cal.2d 296 [267 P.2d 310], dictates a contrary holding. We do not so read the decision. It deals only with the problem of whether or not municipal railway employees were entitled under the charter to compensation for a minimum of eight hours of work in each working day. It was therein held that neither section 125 nor 151.3 of the charter so provided. In considering the latter section the court did specifically say (p. 309): "By the use of the word 'rate,' the charter specifies a wage schedule made up by the measurement of one item on the basis of a unit or quantity of another. As applied to wages, it requires a computation of amount of compensation for a unit of work, in the case of municipal workers, being an hourly wage." The court, of course, was there considering only *municipal platform employees and bus operators* whose rate of pay was and is fixed by the hour, (for instance, see Salary Ordinance for 1948-1949, page 83, defendants' Exhibit A; Salary Ordinance for 1949-1950, page 82, defendants' Exhibit B; and Salary Ordinance for 1951-1952, page 80, defendants' Exhibit C) and not automotive machinists, respondents here, whose rate of pay was and is fixed not by the *hour* but by the *week*. (See same salary ordinances as follows: 1948-1949, page 52; 1949-1950, page 50; 1951-1952, page 45; all following their bargaining agreements in private industry.)

While we thus see the facts of the Gowanlock case are so different from the facts in the case at bar as to be of little assistance to us here, nevertheless, it is interesting to note what the Supreme Court there had to say about the word "rate." It referred to the definition thereof found in Webster's Dictionary as follows, "quality, amount, or degree of a thing measured per unit of something else, . . . amount of payment or charge based on some other amount, as in money obligations, *as the rate of wages per week*."

It seems clear to us, that when the city employs these

people and agrees to pay them at a stated rate *per week* it is bound to do just that, no matter how many days in the week it chooses to instruct them not to report for work, any more than it would have the right to pay an employee who had been hired at the rate of $4 per hour, $3 if he worked three-quarters of an hour, or $3.33⅓ if he worked only 5/6 of an hour. If it is thought this rule should be changed, obviously we are not the ones to do it; our duty begins and ends with declaring what the law is in its present form.

We conclude, therefore, the matter involved here is not that of a holiday which the employees were entitled to take off and did by consequence thereof take off and are now demanding pay for; but the question to be answered is, where the employees were ready, able and willing to work, and were prevented from so doing by the employer for its own purposes, and it had theretofore agreed to pay them at so much per week, may a deduction be made from the employees' wages for the days they were prevented from so working? We conclude that under the ordinances and bargaining agreements hereinabove referred to, the question must be answered in the negative, and the judgment of the lower court affirmed. It is so ordered.

Nourse, P. J., and Dooling, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 23, 1954.