THE SCARSDALE PUBLISHING COMPANY — THE COLONIAL PRESS, Respondent, v. CHARLES EDGERTON CARTER, Appellant.

(Supreme Court, Appellate Term, May, 1909.)

Corporations: Corporate name and domicile and duration of corporate life — Corporate names — Necessity for use: Mode of entering into obligations and power of officers to make contracts — In general — Necessity for use of corporate name.

Deceit — Evidence — Admissibility of evidence; Weight and sufficiency.

A corporation must use its corporate name in the transaction of its business and a contract for the sale of the real property of a corporation, signed with a fragment of its entire corporate name, is not well executed; and a check, drawn to a payee designated by a like fragment of the corporate name, is insufficient to form the basis of a recovery in an action by the corporation against the drawer.

Where one claims to have been induced to purchase building lots belonging to a corporation by representations of the vendor's agent that the lots were situated five to ten minutes' walk from the railroad station; that they had some improvements; that there were cemented sidewalks, gas and water at the property, which representations were false, and the evidence as to fraud is conflicting, the business methods of the corporation, in combining the sale of books with the sale of building lots by installments; its use of a name other than its true corporate name; its organization and control of another corporation, called by a similar name, for the purpose of selling its lots; its picture cards, maps, designs and photographs, all tending to mislead and produce a false impression as to the contiguity of its property to highly developed and improved property, are to be considered in arriving at a determination upon the question of fraud.

APPEAL by the defendant from a judgment in favor of the plaintiff, rendered in the Municipal Court of the city of New York, third district, borough of Manhattan.

L. Barton Case, for appellant.

Henry Stanton, for respondent.

Supreme Court, Appellate Term, May, 1909.     [Vol. 63.

Goff, J.   On March 13, 1907, this form of contract was signed.

"The Colonial Press   *   *   *   Gentlemen:

"I hereby subscribe and agree to pay for one set of the Worlds Great Classics   *   *   *   on the following terms and conditions   *   *   *   5th. The price shall be total $738 for the set of fifteen volumes and shall include the 12 building lots specified on the opposite page. Payable $40. monthly.   *   *   *

"Chas. Edgerton Carter.

"Received $138 cash payment.

"Wm. E. Calvert,
*Representative.*

"Make all checks payable to the Colonial Press."

(Opposite page.)   "In consideration of the foregoing contract and the fulfillment of its conditions under the terms specified, we agree to deliver to Charles Edgerton Carter a Full Covenant and Warranty Deed free of cost for 12 building lots, Nos. 11 to 16 and 27 to 32, 20 x 100 feet each, situated in Block 50 at Belmont Terrace in the Town of Babylon, Long Island, as shown on the map thereof.   *   *   *   The said lots are guaranteed to be high and dry and free from all incumbrances.   *   *   *

"The Colonial Press,
"Per Wm. E. Calvert."

Carter, the defendant, made his check for $138, payable to the order of the Colonial Press, and delivered it to the agent, Calvert. Next day, defendant, becoming " suspicious " of the transaction, stopped payment on the check. The volumes of books mentioned in the contract were delivered to defendant, and subsequently returned by him. After the lapse of over a year plaintiff commenced this action against the defendant on oral complaint for " Breach of contract, Check;" and the defendant answered: ' General Denial, Fraud and Misrepresentation."

Two questions are presented. Did the plaintiff establish a cause of action? Did the defendant establish a valid de-

fense of fraud ?   If the action be considered as on the check, where is the evidence that the plaintiff was the owner of the check ?   It was made payable to " The Colonial Press," in conformity with the printed instructions, receipted for as a cash payment by the " Colonial Press," and acknowledged by letter of " The Colonial Press."   Plaintiff was bound to prove that it was the payee of the check, or the lawful holder thereof by assignment or indorsement.   Plaintiff's attorney, as a witness for plaintiff, said:  " I would like to testify here that the plaintiff is the owner of the check now;" but he went no further, and his expression of what he would like to do cannot be considered evidence. Later on the attorney said:  " I ask this check be marked for identification — I want to add here that the plaintiff is the owner of paper marked ' Plaintiff's Exhibit I ' for identification."   But in this he was urging as attorney and not testifying as a witness; and the zeal of an attorney, no matter how intense, cannot be accepted as legal proof of an essential fact.   Giving, however, the most liberal interpretation to plaintiff's claim, it is that the check, if not in name, was in fact made payable to the plaintiff, and, therefore, it became the owner.   In support of this claim, plaintiff's attorney, as witness, stated that the plaintiff is " a New York corporation and that the full name is ' The Scarsdale Publishing Company — The Colonial Press,' hyphenated, and that it uses a part of the name, ' The Colonial Press,' in a great many contracts made by it."   He further stated that there had been, some years ago, a New Jersey corporation, " The Colonial Press," and another corporation, " The Scarsdale Publishing Company," and that the two names were associated together in the New York incorporated title.   There can be no question but that the contract signed is one for the purchase and sale of real estate.   The mere fact that it also provides for the purchase and sale of books did not detract from its real character. Indeed, that phase of it was at best but an incident, if not a mask.   Reading the two pages of the contract together, it is clear that the relation of vendor and vendee was established.   The vendee agreed to pay a certain sum by monthly

18

instalments for twelve building lots; and the vendor, in consideration thereof, agreed to deliver to the vendee a full covenant and warranty deed for those lots. This then being a contract for the sale of land it had to be signed by the party to be charged. Who was the party? The Colonial Press. It guaranteed against incumbrances and bound itself to deliver a warranty deed; it directed the check to be made payable to its order, and in writing acknowledged its receipt as payment on account for the twelve lots; and it or its assignee had the sole right to maintain an action for any breach of the contract. And, conversely, the vendee could have recourse only to the vendor. If the vendee sought specific performance whom could he sue; "The Colonial Press" or the plaintiff? Manifestly, "The Colonial Press," with whom he was in privity. If he sued the plaintiff he might very well be met with the answer that it had not been a party to the contract and, therefore, not bound. There is not even suggestion that "The Colonial Press" assigned to plaintiff, or that it acted as its representative. The contention is that it was the plaintiff. Assuming the plaintiff to have been duly incorporated it is then a purely artificial creation, having no natural or inherent power, but only such as its charter confers. People v. Ballard, 134 N. Y. 269. The first requisite in the certificate for incorporation is "The name of the proposed corporation." Business Corp. Law, § 2, subd. 1. The name, therefore, is essential to its existence. It becomes a species of property and will be protected as a trade-mark (State v. McGrath, 5 S. W. Rep. 29), and, while by its use advantages are gained, corresponding obligations must be recognized; and one of these is that, in its business dealings and contracts, it must use the name given to it by the law of its existence. It cannot change its name, either directly or by user, nor can the public give it a name other than that of its creation by which it can be recognized in judicial proceedings. Matter of United States Mortgage Co., 83 Hun, 572. The hyphenating a corporate name and amputating one-half of it is not using the corporate name. These two names, "The Scarsdale Publishing Company" and

the " Colonial Press " were at one time distinct enti-
ties; their unification into one corporation existence
does not warrant the use of the name of either as a
substitute for the corporate name.     This is not a case
of misnomer, where an abbreviation was used or a
word of unnecessary description, as where " The Board of
Trustees," etc., was used instead of " The Trustees," etc.
(People ex rel. Fitzgibbons v. N. Y. & Brooklyn Bridge, 1
App. Div. 186), but it is one where good faith, as well as the
law, required that the corporation that, as plaintiff, claimed
to be the real party in interest should be the party to such
an important contract as one for the sale of real estate and
that it should bear an obligation corresponding to the ad-
vantage derived.     The plaintiff failed to prove any privity
of contract, and the defendant's motion to dismiss should
have been granted.     In view of the nature of the case it is
proper to consider the defense of fraud.     It was properly
interposed.     On the plaintiff's own showing the action was
between the original parties to the transaction.     That being
so, the check and the contract, as they related to the same
subject-matter, should be read as one instrument.     Marsh v.
Dodge, 66 N. Y. 533.     But the plaintiff urges that, be-
cause of the provision of the seventh clause, " no verbal
agreements affecting the validity of this contract will be
recognized."     Fraud cannot be an agreement.     It is an
imposture practiced by one upon another.     It may be used
as an inducement to enter into an agreement.     Defend-
ant does not claim that he entered into an agree-
ment that affects the validity of the contract, but that
he was induced by false representations to enter into the
contract.     If that be true the validity of the contract is not
assailed, but its very existence is destroyed.     To constitute
fraud by false representation there must be a representa-
tion of alleged existing fact; that representation must be
false in fact; it must be made with intent to deceive, and
the person to whom it is made must believe it.     Defendant
testified that plaintiff's representative — the material state-
ments only will be referred to — told him that the lots were
situated five to ten minutes' walk from the railroad station;

Supreme Court, Appellate Term, May, 1909.    [Vol. 63.

that the lots had some improvements; that there were cemented sidewalks, gas and water at the property, and he believed those representations. Next day defendant visited the property. He found it distant from the station a mile and a half to two miles. There were no streets, no curbing, no cement sidewalks, no water, no gas and merely lanes made through the weeds and shrubs. In support of the defendant's testimony a witness testified that plaintiff's representative, some days after the contract was signed, met her at defendant's home and, in presence of defendant, repeated the representations he had made to defendant regarding the improvements, stating that the lots he had sold defendant had those improvements; and this was done with a view to interesting her in the purchase of other lots. It was admitted by plaintiff that at the time there were no sidewalks, water or gas on the property. The representations only were denied. This denial was made by plaintiff's representative. Of course, we cannot judge of his appearance and manner on the witness stand; that was for the trial justice. But his language, as reproduced on the record, is before us; and that language, some of which is too vulgar for quotation, stamps him as wholly unworthy of belief. He was asked: "Did you make any such representation that there were gas and water on the property?" Answer: "Qualifiedly." By the court: "What did you say?" Answer: "That Babylon had water, gas and all facilities and that this property was within Babylon." Literally, that may have been true as far as it goes; but it carried with it such a suggestion of falsehood, and was accompanied with such a suppression of the truth that, taken in connection with the other facts, it was clearly made to convey a fraudulent purpose. But, if any doubt remains as to where the preponderance of evidence lay on the question of fraud, that doubt is removed by the plaintiff itself. Its methods of doing business, its combining the sale of books with the sale of building lots by instalments, its dual existence by corporate names — indeed its triple existence, for it organized, controlled and owned another corporation called "The Colonial Development Company," for the purpose of selling ·

those lots — its picture cards, maps, signs and photographs, all tending to mislead and produce a false impression as to the contiguity of "Belmont Terrace" to highly developed and improved property, create an atmosphere of doubt and suspicion and lead to the conclusion, which, in view of the testimony and all of the surrounding circumstances, is irresistible, that the contract was induced by false and fraudulent representations and is, therefore, void.

GILDERSLEEVE and DAYTON, JJ., concur.

Judgment reversed and new trial ordered, with costs to appellant to abide event.